UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
NETCRACKER TECHNOLOGY             :
CORPORATION,
                                                          :
               Plaintiff,       Civil Action
      v.                      :       No. _____

PAVEL RESHETNIK,                  :
                                                          **JURY TRIAL DEMANDED**
               Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

Plaintiff Netcracker Technology Corporation ("Netcracker"), by and through its undersigned counsel, brings this action against Defendant Pavel Reshetnik ("Reshetnik") and alleges upon knowledge with respect to itself and its own acts and otherwise upon information and belief with respect to all other matters as follows:

## NATURE OF THE ACTION

1. Netcracker is a Waltham-based technology company that, among other things, designs and sells business and operations support software ("BSS/OSS") to telecommunications companies, enabling companies to perform mission-critical operations such as monitoring inventory, taking orders, issuing bills and accepting payments.

2. Netcracker's BSS/OSS offerings are not "plug and play" products that customers can purchase and run independently. Netcracker's BSS/OSS products are highly technical, and by their nature, highly customizable solutions that are designed to be configured, implemented and maintained by Netcracker within customers' technological environments using Netcracker's proprietary methods and processes. This form of product delivery allows customers to obtain a tailored, flexible solution that is adapted to their specific and changing needs.

3.      For its part, under licensing and service contracts, Netcracker generates revenue from its BSS/OSS offerings both through the sale of its software and through the services Netcracker provides using Netcracker's proprietary methods and processes.

4.      Netcracker has invested decades and hundreds of millions of dollars developing the proprietary information underlying its BSS/OSS products, as well as the methods and processes used to service those products.

5.      Accordingly, Netcracker takes steps to safeguard the confidentiality of that information, including by asking its employees to agree to reasonable non-compete and confidentiality provisions.  Among other things, those provisions generally prohibit Netcracker employees from engaging in certain competitive activities during their tenure or for a reasonable time after leaving the company, and from using Netcracker's confidential information post-employment.

6.      These provisions are meant to ensure that individuals cannot work for Netcracker for some period of time, gain access to and knowledge of Netcracker's proprietary information, but then leave Netcracker and immediately begin competing against Netcracker, using Netcracker's confidential information to their benefit and Netcracker's detriment.

7.      Nonetheless, that is exactly what Defendant Reshetnik did.

8.      Reshetnik began working for Netcracker in Russia in July 2010 as a Software Engineer.  In 2015, Netcracker helped Reshetnik relocate to the United States as a Technical Manager, where Reshetnik eventually rose through the organization to more senior positions. Netcracker invested time and resources to facilitate Reshetnik's relocation, including sponsoring and paying for his L1-Visa and providing financial assistance for Reshetnik to assimilate in the

U.S., including housing, transportation, baggage fees and additional compensation for general relocation expenses.

9. In 2017, Reshetnik was promoted to a senior level customer support/engineering position at Netcracker. Netcracker further invested in Reshetnik, sponsoring and paying for his Green Card in 2018 at a cost of over $10,000, which was granted in 2021, giving Reshetnik permanent residence status in the U.S. Around the time of his immigration status change, Reshetnik was given the title of Customer Support Lead.

10. When Reshetnik took the U.S. role, he agreed to an Employee/Contractor Proprietary Information, Inventions, Non-Competition, And Non-Solicitation Agreement (the "Agreement," attached hereto as Exhibit A), which contained reasonable non-compete and confidentiality provisions designed to protect Netcracker's business interests.

11. Initially, Reshetnik's role was customer-based and from his arrival in the U.S. in 2015 until October 2019, Reshetnik's work was primarily focused on three customers, all of which are major North American telecommunications companies. During that time, Reshetnik had full access to Netcracker's and each customer's proprietary source code, as well as access into the customers' production environments where Netcracker's solutions were deployed.

12. After October 2019, Reshetnik transitioned into a more managerial role, which included tasks such as resource allocation, serving as an escalation point for his team members, hiring, training and other typical managerial responsibilities. Additionally, he led an internal project working with developers from Netcracker's global team to design, develop and create an internal performance tracker for the global customer support team, called the "AM Performance Tracker." The AM Performance Tracker functions as a dashboard that pulls data from Netcracker's internal ticketing system and other Netcracker platforms. This system generates a

report called the "Commit Report" which allows the administrator of the system access to the applicable platforms to see any Netcracker developer's service tickets and changes to customer source code that were updated and "committed" back to the source code repository.

13. Reshetnik was the administrator of the AM Performance Tracker from the time of its development until he left Netcracker, effectively giving him access to proprietary and highly confidential business information relating to all Netcracker customers.

14. In 2023, Reshetnik amicably separated from Netcracker. As part of that separation process, on August 15, 2023, Reshetnik reaffirmed the ongoing non-compete and confidentiality obligations in the Agreement.

15. But even though he agreed not to compete with Netcracker during his employment and for a reasonable period after his separation, just one month after his separation from Netcracker, on September 6, 2023, Reshetnik founded a company called ESNG One LLC ("ESNG").

16. ESNG holds itself out as a firm that offers "telecom consulting" and "support services related to the Netcracker OSS/BSS solution" that overlap and compete with Netcracker's business. In doing so, ESNG even cites its "extensive experience with the Netcracker system" as a selling point.

17. Within weeks of Reshetnik formally starting ESNG, ESNG announced that it had been chosen as a vendor by European technology company, Sopra Steria Group ("Sopra Steria"), another company that competes with Netcracker.

18. By at least December 2023, Reshetnik was receiving emails from a strategic subsidiary of one of Netcracker's largest customers concerning a technical release upgrade. Those emails detailed user acceptance testing results of the upgrade and data regarding the

4

assignment of open incidents concerning the testing of the upgrade, which are matters that relate to work typically completed by Netcracker for its customers in its regular course of business.

19. And by early 2024, Reshetnik was sending communications on behalf of Sopra Steria to a strategic subsidiary of one of Netcracker's largest customers, where Reshetnik was discussing how he and his team at Sopra Steria could make changes to the customer's installation of Netcracker's BSS/OSS offering—a service that competes with Netcracker's business.

20. Further, Netcracker came to learn that Reshetnik has been among the leaders of a broader effort by Sopra Steria to compete with Netcracker's BSS/OSS business, which Sopra Steria coordinated by enlisting at least eight other former Netcracker employees, including through U.S.-based vendors such as ESNG and an Ohio-based company, Strategic Systems Inc. That effort included Sopra Steria employees making edits and other changes to a customer's installation of Netcracker's BSS/OSS offering—*i.e.*, a service that Netcracker would otherwise perform.

21. Within months of leaving Netcracker, Reshetnik was violating his contractual obligations. Netcracker brings this action to remedy those breaches and enforce its rights.

## **PARTIES**

22. Plaintiff Netcracker is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 95 Sawyer Road, Waltham, Massachusetts 02453.

23. Defendant Reshetnik is an adult individual residing in Marietta, Georgia and a citizen of the State of Georgia.

**JURISDICTION AND VENUE**

24. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Netcracker, a Massachusetts corporation, and Reshetnik, a Georgia citizen, are completely diverse and the amount in controversy exceeds $75,000.

25. Defendant Reshetnik is subject to personal jurisdiction in Massachusetts because Reshetnik consented to exclusive jurisdiction in Massachusetts in Paragraph 11.1 of the Agreement, which provides that any action commenced to resolve any matter arising under or relating to the Agreement shall be commenced only in Massachusetts. Reshetnik further consented in Paragraph 11.1 of the Agreement to personal jurisdiction in the federal courts in the Commonwealth of Massachusetts and the state courts in Suffolk County, Massachusetts. Reshetnik acknowledged the continuing validity of those provisions when he signed his separation agreement from Netcracker on August 15, 2023.

26. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(3).

**FACTUAL BACKGROUND**

**A. Netcracker Is A Technology Company That Depends On Its Proprietary And Confidential Business Information, Which Netcracker Takes Reasonable Steps To Protect**

27. Founded in 1993, Netcracker is a Waltham-based technology company that provides a range of end-to-end, enterprise management software solutions designed to increase the operational efficiency of its customers. Netcracker's various solutions include BSS/OSS offerings for telecommunications companies, which enable those companies to perform mission-critical operational activities in a secure and streamlined manner.

28. With its product offerings, Netcracker also provides services such as planning and consulting, training, operations and maintenance, managed services and outsourcing.

29. Netcracker's BSS/OSS offerings are highly customizable, flexible and scalable. Netcracker has developed baseline code modules underlying its software products that it then customizes depending on its customer's needs. Thus, while there is certain proprietary baseline software coding, architecture, programming, design and processes within Netcracker's offerings, no two Netcracker customers have exactly the same software programs.

30. Netcracker's customized BSS/OSS products must be implemented by Netcracker. Software implementation is a method or process used to integrate software into an end-user's electronic system. Like its software, Netcracker's proprietary implementation methods and processes contain baseline elements. Implementations, though, must also be custom-planned to properly integrate the software into the customer's technological ecosystem. No two customers, then, have the same implementation plan or strategy.

31. This model of product delivery allows customers to obtain a tailored, flexible solution that is adapted to their specific and changing needs.

32. Under licensing and service contracts, Netcracker generates revenue through the sale of its products and through the services Netcracker provides using Netcracker's proprietary methods and processes, charging custom and unique prices depending on the breadth, nature and customization of the software and services provided.

33. Netcracker's proprietary and confidential business information is crucial to its ability to provide these unique and innovative solutions to its customers.

34. Netcracker has spent decades and hundreds of millions of dollars developing its proprietary software products and business strategies.

35. Netcracker's proprietary and confidential business information include, but are not limited to:

- software programming source code, software programming object code, other works of authorship, programs, methods, plans, designs, concepts, improvements, modifications, techniques, discovery research data and results, and know-how related to the technical design, technical architecture, coding, specifications, and programming of both Netcracker's baseline software products and its customizations;

- software programming source code, software programming object code, other works of authorship, program, methods, plans, designs, concepts, improvements, modifications, techniques, discovery research data and results, and know-how related to implementation strategies, designs, architecture, methodologies, specifications, and processes for both those baseline and customized software products with customers; and

- research plans, development plans, plans for new products, marketing and sales strategies, business plans, budgets, graphics and other design elements, unpublished financial statements, licenses, customer pricing, costs, suppliers lists, and customer lists.

36. This information is confidential, proprietary and highly economically valuable to Netcracker, allowing it to compete in the highly-competitive software industry.

37. Accordingly, protection of this information is of existential importance to Netcracker, which takes reasonable precautions to maintain its confidentiality. Among other things, Netcracker:

- requires that any third party to whom any aspect of its intellectual property is disclosed—including customers—first enter into a non-disclosure and confidentiality agreement;

- restricts access to confidential information even within the company (*i.e.*, employees are provided access only to the confidential information they need to fulfill their job responsibilities; they must request special permission to access anything else);

- marks documents containing confidential proprietary information as proprietary and confidential, including a warning that they are not to be used or reproduced absent the express authorization of Netcracker;

- uses secured, password protected networks and databases within Netcracker (*e.g.*, secure, password-protected email servers; secure, password-protected document management systems; secure, password-protected intranet pages);

- includes confidentiality provisions in employment or independent contractor agreements;

- requires employees to return all documents or other information belonging to Netcracker upon the termination of their employment and revokes employee access to Netcracker's systems and networks; and

- requires that employees, in addition to any employment agreement, execute a separate agreement (*e.g.*, the Agreement) through which employees (i) acknowledge Netcracker's sole ownership of its intellectual property and other proprietary information and agree to refrain from using or disclosing it in any way after their employment has ended, and (ii) agree to refrain from competing against Netcracker in certain ways that may jeopardize the confidentiality of Netcracker's intellectual property and proprietary information during their tenure and for a reasonable time after their employment has ended.

**B.    Reshetnik Was A Netcracker Employee Who Signed A Confidentiality And Non-Competition Agreement In Connection With His Employment**

38.    On July 1, 2010, Reshetnik commenced employment with Netcracker in Moscow, Russia as a Software Engineer.

39.    In 2015, Reshetnik was offered and accepted an assignment to the U.S., where he came to work as a Technical Manager. As part of that assignment, Reshetnik was offered a new salary and relocation assistance, including Netcracker sponsoring and paying for his L1-Visa, housing, transportation, baggage fees and additional compensation for relocation expenses.

40.    While in the U.S., Reshetnik primarily resided in the state of Georgia but also did business in Massachusetts, including by traveling to Massachusetts where his manager and Netcracker's headquarters were located.

41.    In 2017, Reshetnik was promoted to a senior level customer support/engineering position at Netcracker.

42.    Netcracker also invested in Reshetnik by sponsoring and paying his Green Card in 2018 at a cost of over $10,000, which was granted in 2021, giving Reshetnik permanent residence status in the United States.

43. Overall, during his tenure with Netcracker, where he ultimately rose to the position of Customer Support Lead, Reshetnik was paid the equivalent of hundreds of thousands of U.S. dollars in salary, bonuses and other benefits.

44. Because of the competitive nature of Netcracker's business and the sensitivity of its proprietary and confidential business information, Netcracker and Reshetnik entered into the Agreement on June 1, 2015 in connection with Reshetnik's assignment to the U.S. and new role.

45. As a condition of and in consideration of his new role with Netcracker and his compensation therefrom, Reshetnik undertook certain contractual obligations to safeguard Netcracker's legitimate interests.

46. Among other things, in signing the Agreement, Reshetnik agreed not to use or disclose Netcracker proprietary and confidential information after his employment ended:

> At all times during my employment/contractor relationship and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information.

(Agreement § 1.1.)

47. "Proprietary Information" is defined to protect Netcracker's intellectual property, including inventions, copyrighted material, and other proprietary and confidential business information. (Agreement § 1.2.)

48. In addition, in order to further protect Netcracker's proprietary and confidential information and other legitimate business interests, Reshetnik also agreed to refrain from

engaging in certain competitive activities against Netcracker during the course of his employment and for a period of one year after his employment ended:

> I acknowledge that during my employment/contractor relationship I will have access to and knowledge of Proprietary Information. To protect the Company's Proprietary Information, and to protect the Company's good will with clients and customers, I agree that during my employment/contractor relationship with the Company, whether full-time or part-time, and for a period of one year after my last day of employment/contractor relationship with the Company, regardless of the reasons for the termination of my employment/engagement, I will not directly or indirectly engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest in, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages in a "Restricted Business" in a "Restricted Territory" (as defined below) . . . .
>
> I agree and acknowledge that the time limitation on the restrictions in this paragraph, combined with its geographic scope, is reasonable. I also acknowledge and agree that this paragraph is reasonably necessary for the protection of the Company's Proprietary Information as defined in Section 1.2, and for the protection of goodwill with clients and customers that I have received.

(Agreement § 4.)

49. "Restricted Business" is defined in the Agreement to include any business that competes with Netcracker or is planning to do so at the time of Reshetnik's employment with Netcracker. (Agreement § 4.3(i).)

50. Because Reshetnik was not assigned to work in or cover any specific location (as his role encompassed worldwide support of Netcracker's entire customer base), "Restricted Territory" is defined in relevant part to include any location in which Netcracker conducts business. (Agreement § 4.3(ii).)

51. The Agreement is governed by Massachusetts law. (Agreement § 11.1.)

### C. While At Netcracker, Reshetnik Had Access To Considerable Proprietary And Confidential Netcracker Information

52. Reshetnik's roles at Netcracker gave him significant access to Netcracker's proprietary information.

53. Initially, Reshetnik's role in the U.S. was customer-based. From his arrival in the U.S. in 2015 until October 2019, Reshetnik's work was primarily focused on three customers, all of which are major North American telecommunications companies.

54. During that time, Reshetnik had full access to Netcracker's proprietary and confidential information that was used in connection with those customers, as well as full access to those customers' production environments and those customers' own proprietary source code.

55. After October 2019, Reshetnik transitioned into a more managerial role, which included tasks such as resource allocation, serving as an escalation point for his team members, hiring, training and other typical managerial responsibilities.

56. In that role, Reshetnik led an internal project working with developers from Netcracker's global team to design, develop and create an internal performance tracker for the global customer support team, called the "AM Performance Tracker."

57. The AM Performance Tracker was developed on an opensource software platform and functions as a UI/Dashboard that pulls data from Netcracker's internal ticketing system (JIRA) and other Netcracker platforms. This tracking system generates a report called the "Commit Report" which allows the administrator of the system to access the applicable platforms to see any Netcracker developer's service tickets and changes to customer source code that were updated and "committed" back to the source code repository.

58. Reshetnik was the administrator of the AM Performance Tracker from the time of its development until he left Netcracker in August 2023, which effectively gave him unfettered

access to Netcracker's proprietary and highly confidential business information related to all Netcracker customers during that time.

### D. Reshetnik Amicably Separated From Netcracker In 2023 And Reaffirmed His Ongoing Confidentiality And Non-Competition Obligations At That Time

59. On August 15, 2023, Reshetnik signed an agreement formalizing his amicable separation from Netcracker.

60. In connection with Reshetnik's separation from Netcracker, Reshetnik received severance equivalent to thirteen weeks of his base salary, as well as a prorated bonus payment.

61. In exchange, Reshetnik released certain claims he may have had against Netcracker and agreed to certain continuing obligations: Reshetnik agreed not to disparage Netcracker and to keep the terms of his separation agreement confidential, and he reaffirmed that he would comply with the confidentiality and non-competition obligations in the Agreement.

### E. Within Weeks Of Leaving Netcracker, Reshetnik Was Competing Against Netcracker In Violation Of His Contractual Obligations

62. Less than one month after leaving Netcracker and reaffirming his promise not to compete against Netcracker for a one-year period, Reshetnik formed ESNG.

63. In a public LinkedIn post discussing ESNG, Reshetnik stated: "I'm delighted to reveal that I've started my own consulting firm ESNG One. This announcement came somewhat late because I've been in operation since last September."

64. According to ESNG's website, which cites ESNG's "vast experience in various [customer relationship management] and OSS/BSS systems, such as Netcracker" as a selling point, ESNG offers a range of services, including "telecom consulting" services that overlap and compete with Netcracker's business.

65. In a public LinkedIn post from 2024, ESNG further stated that it seeks to offer "support services related to the Netcracker OSS/BSS solution"—services that undoubtedly

13

overlap and compete with Netcracker's business—which ESNG claims it is able to provide based on "our comprehensive OSS/BSS knowledge and experience with the Netcracker system."

66. Within weeks of founding ESNG, ESNG announced that it had been chosen as a vendor by Sopra Steria "to deliver a comprehensive range of consulting services."

67. Sopra Steria is a European technology company that, among other things, offers BSS/OSS solutions and services that compete with Netcracker's business.

68. Reshetnik violated his non-compete obligations to Netcracker (and announced he was doing so publicly) by forming ESNG, seeking to offer competing services, and engaging with Sopra Steria. But Reshetnik's violations did not end there.

69. By at least December 2023, Reshetnik was receiving emails from a strategic subsidiary of one of Netcracker's largest customers concerning a technical release upgrade. Those emails detailed user acceptance testing results of the upgrade and data regarding the assignment of open incidents concerning the testing of the upgrade, which are matters that relate to work typically completed by Netcracker for its customers in its regular course of business.

70. By early 2024, Reshetnik was directly communicating on behalf of Sopra Steria with a strategic subsidiary of one of Netcracker's customers regarding how Reshetnik and his team at Sopra Steria could make changes to that customer's installation of Netcracker's BSS/OSS offering—a service that competes with Netcracker's business.

71. Through the course of providing those competing services to Netcracker's customer, Reshetnik deprived Netcracker of business and goodwill, and caused injury to Netcracker's relationship with its customer.

72. Further, Netcracker came to learn that Reshetnik has been among the leaders of a broader effort by Sopra Steria to compete with Netcracker's BSS/OSS business, which Sopra

Steria coordinated by enlisting at least eight other former Netcracker employees, including through U.S.-based vendors such as ESNG—Reshetnik's company—and an Ohio-based company, Strategic Systems Inc.

73. That effort included Sopra Steria employees making edits and other changes to a customer's installation of Netcracker's BSS/OSS offering—*i.e.*, a service that Netcracker would otherwise perform.

74. Reshetnik's participation in this effort also constitutes a breach of his obligations under the Agreement and has caused injury to Netcracker.

## **COUNT ONE**
### **(Breach of Contract)**

75. Netcracker repeats and realleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

76. The Agreement is a valid and binding written contract between Netcracker and Reshetnik, which includes reasonable restrictive covenants that are limited in scope.

77. Netcracker fully performed its obligations under the Agreement.

78. The Agreement was made for valid consideration. In exchange for agreeing to the restrictions in the Agreement, Reshetnik received thousands of dollars of compensation and assistance relocating to the United States, among other things.

79. The restrictions in the Agreement are reasonable, consistent with public policy and necessary to protect Netcracker's proprietary and confidential information, relationships with its customers and other reasonable competitive business interests.

80. Reshetnik breached the restrictive covenants in the Agreement by performing implementation services on a Netcracker BSS/OSS customer installation on behalf of Sopra

Steria—a service Netcracker also provides and which is central to its business—during a period in which Reshetnik was contractually bound not to compete against Netcracker.

81. Netcracker has suffered damages as a result of Reshetnik's breach of contract including the loss of business, injury to Netcracker's competitive place in the BSS/OSS market and injury to Netcracker's relationship with its customers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Netcracker respectfully requests that this Court enter judgment in its favor against Reshetnik and award Netcracker the following relief:

(a) monetary damages to the extent they may be ascertained and in an amount to be determined at trial, but in no event less than $75,000;

(b) reasonable costs and attorneys' fees in prosecution of its claims;

(c) pre-and post-judgment interest; and

(d) such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff Netcracker demands a jury trial on all claims so triable.

Dated:  January 24, 2025           Respectfully submitted,
        Boston, Massachusetts

                                   /s/ *James R. Carroll*
                                   James R. Carroll (BBO #554426)
                                   Nigel Tamton (BBO #696396)
                                   SKADDEN, ARPS, SLATE,
                                      MEAGHER & FLOM LLP
                                   500 Boylston Street
                                   Boston, Massachusetts 02116
                                   (617) 573-4800
                                   james.carroll@skadden.com
                                   nigel.tamton@skadden.com

                                   *Counsel for Plaintiff*
                                   *Netcracker Technology Corporation*